UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

ASID MOHAMAD; ASID MOHAMMAD as the
representative of the Estate of AZZAM RAHIM;
SHAHID MOHAMAD; SAID MOHAMAD; SHAHED
AZZAM RAHIM; MASHUD RAHIM; and ASIA
RAHIM,

Docket No:
_____-cv_____

**COMPLAINT**

**Jury trial demanded**

                         Plaintiff,

              -against-

JIBRIL RAJOUB

                         Defendant.

------------------------------------------------------------------X

Plaintiffs, complaining of the Defendant, by their attorneys, The Berkman Law Office,
LLC, allege their complaint as follows:

## NATURE OF THIS ACTION

1.       This is an action for compensatory and punitive damages that is being brought by
the estate, survivors and heirs of Azzam Rahim, a United States citizen, who was brutally
tortured and extra-judicially killed by the Defendant on September 29, 1995 in violation of
common law, statutory law, the law of nations, the Alien Tort Claims Act, and the Torture
Victim Protection Act.

## THE PARTIES

2.       Azzam Rahim was a United States citizen. On or about September 27-29, 1995,
Azzam Rahim was subjected to brutal torture and ultimately extra-judicially killed by the
defendant when he was in defendant's custody and/or physical control.

3.      The plaintiff ASID MOHAMAD is the son of Azzam Rahim and is a United States Citizen.

4.      The plaintiff SHAHID MOHAMAD is the son of Azzam Rahim and is a United States Citizen.

5.      The plaintiff SAID MOHAMAD is the son of Azzam Rahim and is a United States Citizen.

6.      The plaintiff SHAHED AZZAM RAHIM is the son of Azzam Rahim and is a United States Citizen.

7.      The plaintiff MASHHUD RAHIM is the son of Azzam Rahim and is a United States Citizen.

8.      The plaintiff MOHAMAD RAHIM is the son of Azzam Rahim and is a United States Citizen.

9.      The plaintiff ASIA RAHIM is the widow of Azzam Rahim and is a United States Citizen..

10.      Upon information and belief, defendant JIBRIL RAJOUB was at all times relevant to this complaint the head of the Palestinian Preventive Security Force (hereinafter PPSF) AKA Palestinian Preventive Security Services (hereinafter PSS) in the West Bank. The PPSF is part of the Palestinian Authority, AKA Palestinian Interim Self-Government Authority (hereinafter PA). The PA is a non-sovereign quasi-governmental body which was established pursuant to the Oslo Accords, signed between the Palestine Liberation Organization and the State of Israel to provide certain municipal services in parts of the West Bank and Gaza Strip.

11.      At all times relevant to this complaint defendant Jibril Rajoub in addition to his position as head of the PPSF, was also a high ranking official with the PA. As head of the PPSF,

Defendant, with official or apparent authority carried out or caused to be carried out acts of torture and extra-judicial killing pursuant to the general policy of the Palestinian Authority leadership.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction as the claim arises at least in part pursuant to 28 U.S.C. § 1331 and the Torture Victim Protection Act, 28 U.S.C. § 1350, note.

13.    This Court also has jurisdiction over this matter as this is a dispute between the plaintiffs, who are citizens of the United States, and the defendant, who upon information and belief is a citizen of Jordan, the Palestinian Authority, and/or some other country, but not the United States.

14.    Additionally, this Court has jurisdiction under 28 U S.C. § 1331 for those international law claims that arise under federal common law.

## THE UNDERLYING FACTS

15.    On Wednesday September 27, 1995, members of the PPSF, acting under color of law, arrested Azzam Rahim, a Palestinian-American citizen and took him to the Jericho prison where he was illegally imprisoned and subjected to brutal torture before being murdered on September 29, 1995.

16.    Azzam Rahim was born and raised in the West Bank. Azzam Rahim immigrated to the United States in the 1970's where he eventually became an American citizen and a successful businessman.

17.    Azzam Rahim later married and along with his wife, Asia Rahim, had six children.

18.     After the Oslo Accords were signed in the early 1993 by representatives of Israel and the Palestinians, Azzam Rahim decided to visit his boyhood village, Ein Yabroud, in the West Bank. Azzam Rahim left one of his sons in charge of his U.S. business while he was away.

19.     Ein Yabroud is a West Bank village with a relatively large number of American citizens, and while he was visiting Azzam Rahim charitably contributed to the development of the village by, for example, making donations for a village school.

20.     On Wednesday September 27, 1995, Azzam Rahim was 52-years-old, in good health and had been in the West Bank for only about a month.

21.     While sitting with friends and playing cards in a coffee shop in Ein Yabroud between several plain clothes men who identified themselves as security police arrived outside.

22.     Without explanation the security police approached Azzam Rahim and ordered him to come with them.

23.     The security officers placed Azzam Rahim in an unmarked car and took him to a prison in Jericho maintained by West Bank security chief defendant Jibril Rajoub. It was at this prison that Azzam Rahim was tortured.

24.     Local villagers in Ein Yabroud recognized the security police officers who seized Azzam Rahim and drove him away from the coffee shop as agents of defendant Jibril Rajoub.

25.     When Azzam Rahim did not return to the home where he was staying after several hours, members of his family grew concerned and called him on his mobile phone.

26.     Azzam Rahim answered the phone and blurted out: "I'm with those who took me, here in Jericho," and then the call was suddenly disconnected. Subsequent phone calls to his number were never answered.

27.     Fearful that he was in serious danger, Azzam Rahim's family traveled to Jericho on Thursday, September 28, 1995 in an unsuccessful attempt to see him and determine his situation.

28.     At the headquarters of the Preventive Security Service, police officers informed the family that Azzam Rahim was being detained by their police at the prison.

29.     Later on, however, the family was told that Azzam Rahim was being detained by the Palestinian intelligence service, a different Palestinian security agency.

30.     Azzam Rahim's son, plaintiff Shahed Azzam Rahim, drove to the defendant Jibril Rajoub's headquarters to directly confront the security chief over the reasons for his father's arrest and as to where he was being held.

31.     Shahed Azzam Rahim did not manage to meet with Jibril Rajoub but spoke with another officer at Rajoub's office. The officer, who identified himself as Abu Said, initially denied he had any knowledge of Azzam Rahim but eventually declared he would be released the next day.

32.     On Friday, September 29, 1995, an ambulance arrived at Ein Yabroud. The ambulance driver delivered the corpse of Azzam Rahim dressed only in trousers. The driver informed the family that Azzam Rahim had allegedly died of a "heart attack" at Jericho Hospital and that Jibril Rajoub's office would forward to them a death certificate.

33.     The Jericho Hospital, however, later informed Azzam Rahim's family that he was already dead when he had been brought into the hospital.

34.     When Azzam Rahim's family inspected his body they were horrified to discover that Azzam Rahim had been tortured to death by the Defendant.

35.     Azzam Rahim had, among other signs of torture and brutality, a blue bruise on his forehead, a torn lip, various cuts and bruises on his face, broken teeth and dried blood which had flowed from his right ear.

36.     Additionally, there were signs of numerous cigarette burns on his back and legs.

37.     News reporters who viewed Azzam Rahim's body before his funeral on Friday September 29, 1995 reported that they saw signs of beatings, including welts, cuts and bruises on his face.

38.     The reporters said that the Ein Yabroud residents were unable to understand what had prompted Azzam Rahim's arrest and torture by the security police.

39.     According to Muslim tradition a corpse must be buried on the same day as the death and funeral was quickly arranged by the family for later on in the day.

40.     Azzam Rahim's family members told reporters during the Friday funeral on September 29, 1995 that they had been warned of retaliations by Jibril Rajoub's forces and urged not to talk about the murder with anyone.

41.     One relative, speaking on condition of anonymity to a reporter, said Rajoub's police had threatened to arrest one of Azzam Rahim's sons should details of the murder be leaked.

42.     Reporters who called Rajoub's Jericho headquarters said a man answering the telephone on Friday September 29, 1995 informed them that an order had been given not to discuss the case.

43.     A statement subsequently issued Saturday September 30, 1995 by Rajoub's Jericho headquarters denied that Azzam Rahim had been detained by the Palestinian security police.

-6-

44.     The family contacted the United States State Department and informed them of Azzam Rahim's murder

45.     On September 30, 1995, officials from the United States Consulate in Jerusalem met with Palestinian security officers in Jericho to discuss the torture and murder.

46.     United States officials said afterward that Palestinian leader Yasser Arafat had ordered an official investigation into the murder.

47.     A Palestinian official speaking to a reporter anonymously said that then American President Bill Clinton personally asked Arafat to look into Azzam Rahim's murder. "The case has reached the highest level," the official said.

48.     The Deputy United States Consul General in Jerusalem, John Bargeron, met on September 30, 1995 with the Jericho police chief, Hajj Ismail Jaber, and was told that the inquiry had already begun. A consulate spokeswoman said, "We are taking this very seriously, and we've asked for a full investigation."

49.     On October 1, 1995 Palestinian Attorney-General Khaled Al-Kidreh attempted to fabricate a story to cover up the true facts of the torture and murder of Azzam Rahim. Absurdly Al-Kidreh contended that Rahim "headed a gang of thieves that is also responsible for the death of people" and that "he was confronted with all the evidence that proved his guilt, and as a result he was shocked and suffered a heart attack."

50.     The family eventually had Azzam Rahim's body exhumed and a professional autopsy was performed.

51.     The autopsy report indicated and that Azzam Rahim had several broken ribs and that he appeared to have no heart damage.

52.     On Thursday October 12, 1995 Al-Kidreh told the Associated Press that the case was still being investigated. "We will decide whether to prosecute at the end of the investigation. Anyone who is found to be related to the death of this person will be prosecuted."

53.     On July 23, 1996 at a hearing investigating human rights abuses by the Palestinian Authority before the Subcommittee on International Operations and Human Rights of the Committee on International Relations of the United States House of Representatives, Maryam Elahi, Program Officer for the Middle East, North Africa, and Europe at the Washington office of Amnesty International testified that she had recently returned from a mission to the area under the jurisdiction of the Palestinian Authority. Elahi testified that Amnesty International felt that the Palestinian Authority had not carried out an investigation with public findings into the death in custody of Azzam Rahim nor into the suspicious death of five other Palestinians who died while being held in the custody of the Palestinian Authority. According to Elahi, five of these deaths occurred in circumstances suggesting that torture or ill treatment contributed to the deaths.

54.     Unfortunately, not much has changed with regard to the Palestinian Authority's human rights practices since the July 23, 1996 Congressional hearing nor was Azzam Rahim' torture and extrajudicial killing unique. The Palestinian Authority, and its constituent departments, agencies and security apparatus, including the Palestinian Preventive Security Force, has routinely carried out the torture and extrajudicial killings of numerous other Palestinians with relative impunity; Palestinians who are tortured and killed with far less attention than the murder of Azzam Rahim, an American citizen.

55.     This pattern of intimidation and brutality has been extensively documented by the United States State Department and by numerous human rights groups such as Amnesty International, Human Rights Watch, and the Israeli human rights group B'tselem.

56.     The horrific acts committed against Azzam Rahim were inflicted under color of law and under official authority in violation of the law of nations, and were inflicted deliberately and intentionally.

57.     The acts and injuries that Assam Rahim suffered were part of a pattern and practice of systematic human rights violations that were are designed, ordered, implemented, and directed by the defendant.

58.     Such acts were and are carried out pursuant to a general policy of the Palestinian Authority of which the Palestinian Preventive Security Force is a part, as well as the PLO leadership. All such acts were designed to terrorize the Palestinian population to ensure that an elite Palestinian leadership circle is able to maintain power at all costs.

59.     Despite the repeated attempts of Azzam Rahim's family to obtain definitive answers and justice from defendant Jibril Rajoub, as well as the Palestinian Authority, the PLO and the PPFS, the family received no answers or justice. Instead of answers, they received nothing but threats and intimidation.

60.     Further compounding their pain, defendant and the PA have refused to provide the family of Azzam Rahim with any measure of compensation or even formally acknowledge defendant Jibril Rajoub's responsibility for the brutal death of Azzam Rahim.

### AS AND FOR A FIRST CLAIM FOR RELIEF
*Committing Acts of Torture and Extrajudicial Killing in Violation Of The*
*Torture Victim Protection Act 28 U.S.C. § 1350, notes*

61.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

62.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

63.     Azzam Rahim was kidnapped and ultimately murdered by the defendant Rajoub, his agents, servants, and employees, including security forces of the Palestinian Authority and systematically tortured and murdered through beatings and cigarette burnings.

64.     This torture and murder was carried out by or ordered by the defendant Rajoub, his agents, servants, and employees.

65.     As a result of the Defendant's acts the Plaintiffs have been grievously harmed.

66.     Plaintiffs have exhausted all other remedies for obtaining justice.

67.     Plaintiffs are therefore entitled to maintain an action under the Torture Victims Protection Act.

68.     By reason of the foregoing, the plaintiffs are entitled to recover the full extent of their damages, in an amount to be determined by the jury at trial

### AS AND FOR A SECOND CLAIM FOR RELIEF
*Committing Acts of Torture and Extrajudicial Killing in Violation of*
*The Law of Nations Pursuant to 18 U.S.C. § 1350*

69.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

70.     Azzam Rahim was kidnapped by the defendant Rajoub, his agents, servants, and employees, including the security forces of the Palestinian Authority and systematically tortured and murdered.

71.     This torture and murder was carried out or ordered by the defendant Rajoub, his agents, servants, and employees.

72.     The kidnapping and systematic torture and murder of Azzam Rahim by the defendant Rajoub, his agents, servants, and employees, was a violation of the law of nations, i.e., international law.

-10-

73.     As a result of acts of the defendant Rajoub, his agents, servants, and employees, the Plaintiffs have been grievously harmed.

74.     Plaintiffs have exhausted all other remedies for obtaining justice.

75.     By reason of the foregoing, the plaintiffs are entitled to recover the full extent of their damages, in an amount to be determined by the jury at trial

**AS AND FOR A THIRD CLAIM FOR RELIEF**
*Committing Acts of Torture and Extrajudicial Killing in Violation*
*of The Law of Nations Pursuant to 28 U.S.C. § 1331*

76.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

77.     Azzam Rahim was kidnapped by the defendant Rajoub, his agents, servants, and employees, including the security forces of under the command of the defendant Rajoub, his agents, servants, and employees, and systematically tortured and murdered through physical and psychological abuse, including beatings and cigarette burnings.

78.     This kidnapping, torture and murder was carried out or ordered by the defendant Rajoub, his agents, servants, and employees,.

79.     The kidnapping and systematic torture of Azzam Rahim by the defendant Rajoub, his agents, servants, and employees, was a violation of the law of nations, i.e., international law, and, thus, federal common law.

80.     As a result of acts of the defendant Rajoub, his agents, servants, and employees, the plaintiffs have been grievously harmed.

81.     Plaintiffs have exhausted all other remedies for obtaining justice.

82.     By reason of the foregoing, the plaintiffs are entitled to recover the full extent of their damages, in an amount to be determined by the jury at trial

## AS AND FOR A FOURTH CLAIM FOR RELIEF

*Assault, Battery, False Imprisonment, Wrongful Death, Prima Facie Tort, Intentional Infliction of Emotional Distress, and Breach of Sepulcher Under the Law of the Forum State*

83.    Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

84.    The defendant Rajoub, and his agents, servants, and employees, placed the plaintiff's decedent in fear of imminent bodily harm.

85.    The defendant Rajoub, and his agents, servants, and employees, caused the plaintiff's decedent to suffer bodily harm.

86.    The defendant Rajoub, and his agents, servants, and employees, wrongfully detained the plaintiff's decedent.

87.    The defendant Rajoub, and his agents, servants, and employees, caused the wrongful death of the plaintiff's decedent.

88.    The defendant Rajoub, and his agents, servants, and employees, intentionally inflicted harm on the plaintiffs and the plaintiff's decedent, resulting in special damages, without any excuse or justification, by an act or series of acts that would otherwise have been lawful, with a desire to injure the plaintiffs and their decedent.

89.    The defendant Rajoub, and his agents, servants, and employees, acted intentionally or recklessly in an extreme and outrageous manner, causing plaintiffs and their decedent to suffer severe emotional distress.

90.    The defendant Rajoub, and his agents, servants, and employees, mishandled and defiled the corpse of the plaintiffs' decedent, and thereby violated the plaintiffs' right of sepulcher.

91.    As a result of the Defendant's acts the plaintiffs have been grievously harmed.

92.     Plaintiffs have exhausted all other remedies for obtaining justice.

93.     By reason of the foregoing, the plaintiffs are entitled to recover the full extent of their damages, in an amount to be determined by the jury at trial

**AS AND FOR A FIFTH CLAIM FOR RELIEF**

*Assault, Battery, False Imprisonment, Wrongful Death, Prima Facie Tort, Intentional Infliction of Emotional Distress, and Breach of Sepulcher Under the Law of the West Bank*

94.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

95.     The defendant Rajoub, and his agents, servants, and employees, placed the plaintiff's decedent in fear of imminent bodily harm.

96.     The defendant Rajoub, and his agents, servants, and employees, caused the plaintiff's decedent to suffer bodily harm.

97.     The defendant Rajoub, and his agents, servants, and employees, wrongfully detained the plaintiff's decedent.

98.     The defendant Rajoub, and his agents, servants, and employees, caused the wrongful death of the plaintiff's decedent.

99.     The defendant Rajoub, and his agents, servants, and employees, intentionally inflicted harm on the plaintiffs and the plaintiff's decedent, resulting in special damages, without any excuse or justification, by an act or series of acts that would otherwise have been lawful, with a desire to injure the plaintiffs and their decedent.

100.    The defendant Rajoub, and his agents, servants, and employees, acted intentionally or recklessly in an extreme and outrageous manner, causing plaintiffs and their decedent to suffer severe emotional distress.

101.    The defendant Rajoub, and his agents, servants, and employees, mishandled and defiled the corpse of the plaintiffs' decedent, and thereby violated the plaintiffs' right of sepulcher.

102.    As a result of the Defendant's acts the plaintiffs have been grievously harmed.

103.    Plaintiffs have exhausted all other remedies for obtaining justice.

104.    By reason of the foregoing, the plaintiffs are entitled to recover the full extent of their damages, in an amount to be determined by the jury at trial

**WHEREFORE**, the plaintiffs demand judgment against the defendant Jibril Rajoub for compensatory, punitive and exemplary damages according to proof, in no event exceeding $250,000,000, plus attorney's fees to the extent permitted by law, and for such other and further relief as the court may deem just and proper.

A JURY TRIAL IS DEMANDED ON ALL ISSUES.

Dated:  Brooklyn, New York
        April 3, 2017

                                        Yours,

                                        THE BERKMAN LAW OFFICE, LLC
                                        *Attorneys for the plaintiffs*

                                        by:   _____
                                              Robert J. Tolchin

                                        111 Livingston Street, Suite 1928
                                        Brooklyn, New York 11201
                                        (718) 855-3627