| 102D CONGRESS 1st Session | HOUSE OF REPRESENTATIVES | REPT. 102-367 Part 1 |
|---|---|---|

# TORTURE VICTIM PROTECTION ACT OF 1991

NOVEMBER 25, 1991.—Ordered to be printed

Mr. BROOKS, from the Committee on the Judiciary, submitted the following

# REPORT

[To accompany H.R. 2092 which on July 29, 1991, was referred jointly to the Committee on Foreign Affairs and the Committee on the Judiciary]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 2092) to carry out obligations of the United States under the United Nations Charter and other international agreements pertaining to the protection of human rights by establishing a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing, having considered the same, report favorably thereon with an amendment and recommend that the bill, as amended, do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Torture Victim Protection Act of 1991"

SEC. 2. ESTABLISHMENT OF CIVIL ACTION.

(a) LIABILITY.—An individual who, under actual or apparent authority, or color of law, of any foreign nation—
  (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
  (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

(b) EXHAUSTION OF REMEDIES.—A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.

(c) STATUTE OF LIMITATIONS.—No action shall be maintained under this section unless it is commenced within 10 years after the cause of action arose.

SEC. 3. DEFINITIONS.

(a) EXTRAJUDICIAL KILLING.—For the purposes of this Act, the term "extrajudicial killing" means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

(b) TORTURE.—For the purposes of this Act—

(1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the sense or the personality;

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

### EXPLANATION OF AMENDMENT

Inasmuch as H.R. 2092 was ordered reported with a single amendment in the nature of a substitute, the contents of this report constitute an explanation of that amendment.

### SUMMARY AND PURPOSE

The purpose of H.R. 2092 is to provide a Federal cause of action against any individual who, under actual or apparent authority, or color of law, of any foreign nation, subjects any individual to torture or extrajudicial killing.

### HEARINGS

No hearings were held on H.R. 2092 during the 102d Congress. Predecessor legislation, H.R. 1417, was the subject of hearings before the Foreign Affairs Subcommittee on Human Rights on March 23, 1988, and April 20, 1988.

### COMMITTEE VOTE

On November 19, 1991, a reporting quorum being present, the Committee on the Judiciary ordered H.R. 2092 favorably reported to the House by voice vote with a single amendment in the nature of a substitute.

### DISCUSSION

*I. Background*

Official torture and summary execution violate standards accepted by virtually every nation. The universal consensus condemning these practices has assumed the status of customary international

law. As the Second Circuit Court of Appeals held in 1980, "official torture is now prohibited by the law of nations."*Filartiqa* v. *Pena-Irala,* 630 F.2d 876, 884 (2d Cir. 1980). The prohibition against summary executions has acquired a similar status.

These universal principles provide scant comfort, however, to the many thousands of victims of torture and summary executions around the world. Despite universal condemnation of these abuses, many of the world's governments still engage in or tolerate torture of their citizens, and state authorities have killed hundreds of thousands of people in recent years. (See "Amnesty International, Political Killings by Governments 5" (1983).) Too often, international standards forbidding torture and summary executions are honored in the breach.

For this reason, recent international initiatives seeking to address these human rights violations have placed special emphasis on enforcement measures. A notable example is the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which was adopted, with strong support from the U.S. Government, by the U.N. General Assembly on December 10, 1984. The Convention was signed by the United States on April 18, 1988 and ratified by the U.S. Senate on October 27, 1990. Essentially enforcement-oriented, this Convention obligates state parties to adopt measures to ensure that torturers are held legally accountable for their acts.

One such obligation is to provide means of civil redress to victims of torture. Judicial protections agains flagrant human rights violations are often least effective in those countries where such abuses are most prevalent. A state that practices torture and summary execution is not one that adheres to the rule of law. The general collapse of democratic institutions characteristic of countries scourged by massive violations of fundamental rights rarely leaves the judiciary intact. The Torture Victim Protection Act [TVPA], H.R. 2092, would response to this situation.

*II. Need for legislation*

The TVPA would establish an unambiguous and modern basis for a cause of action that has been successfully maintained under an existing law, section 1350 of the Judiciary Act of 1789 (the Alien Tort Claims Act), which permits Federal district courts to hear claims by aliens for torts committed "in violation of the law of nations." (28 U.S.C. sec. 1350). Section 1350 has other important uses and should not be replaced. There should also, however, be a clear and specific remedy, not limited to aliens, for torture and extrajudicial killing.

In the case of *Filartiqa* v. *Pena-Irala,* the Second Circuit Court of Appeals recognized a right of action against foreign torturers under the rarely invoked Alien Tort Claims Act. Citizens of Paraguay brought suit in Federal court against a former inspector general of police, who had tortured to death a family member of the plaintiffs, and who was present in the United States. The district court dismissed the complaint for lack of jurisdiction, construing the phrase "law of nations" narrowly; the Court of Appeals reversed. The appellate court unanimously acknowledged that although torture of one's own citizens was not recognized as a viola-

Exhibit D

tion of the law of nations in 1789, when the Alien Tort Claims Act was enacted, the universal prohibition of torture had ripened into a rule of customary international law, thereby bringing torture squarely within the language of the statute. (See *Filartiga*, 630 F.2d at 844–85).

The *Filartiga* case met with general approval. At least one Federal judge, however, questioned whether section 1350 can be used by victims of torture committed in foreign nations absent an explicit grant of a cause of action. In *Tel-Oren* v. *Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), cert. denied 470 U.S. 103 (1985), a case involving terrorist activities of the Palestine Liberation Organization, Judge Bork questioned the existence of a private right of action under the Alien Tort Claims Act, reasoning that separation of powers principles required an explicit—and preferably contemporary—grant by Congress of a private right of action before U.S. courts could consider cases likely to impact on U.S. foreign relations.

The TVPA would provide such a grant, and would also enhance the remedy already available under section 1350 in an important respect: While the Alien Tort Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad. Official torture and summary executions merit special attention in a statute expressly addressed to those practices. At the same time, claims based on torture or summary executions do not exhaust the list of actions that may appropriately be covered be section 1350. That statute should remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law.

### III. *Summary of H.R. 2092, as amended*

The legislation authorizes the Federal courts to hear cases brought by or on behalf of a victim of any individual who, under actual or apparent authority, or color of law, of any foreign nation, subjects a person to torture or extrajudicial killing. It defines "torture" and "extrajudicial killing' in accordance with international standards. The bill would apply only to those acts undertaken under color of official authority. Only "individuals," not foreign states, can be sued under the bill. Striking a balance between the desirability of providing redress for a victim and the fear of imposing additional burdens on U.S. courts, the bill recognizes as a defense the existence of adequate remedies in the country where the violation allegedly occurred.

In cases of extrajudicial killing, because the victim will not be alive to bring suit, the victims "legal representative' and 'any person who may be a claimant in an action for wrongful death" may bring suit. Courts may look to state law for guidance as to which parties would be proper wrongful death claimants.

The definition of "torture" in the legislation is limited to acts by which severe pain or suffering, whether physical or mental, is intentionally inflicted for such purposes as obtaining a confession, punishment, or coercion. This language tracks the definition of "torture" adopted in the Torture Convention and the understandings included in the Senate's ratification of the Convention. Like

EXHIBIT

the definition included in the Torture Convention, this one also specifically excludes "pain and suffering arising only from or inherent in, or incidental to, lawful sanctions." Thus, the act would not permit suits based on the pain inherent in lawfully imposed punishments.

The term "extrajudicial killing" is defined in the bill as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." The definition thus excludes executions carried out under proper judicial authority. The inclusion of the word "deliberated" is sufficient also to include killings that lack the requisite extrajudicial intent, such as those caused by a police officer's authorized use of deadly force. The concept of "extrajudicial killings" is derived from article 3 common to the four Geneva Conventions of 1949.

The phrase "under actual or apparent authority, or color of law" makes clear that the plaintiff must establish some governmental involvement in the torture or killing to prove a claim. Courts should look to 42 U.S.C. Sec. 1983 is construing "color of law" and agency law in construing "actual or apparent authority." The bill does not attempt to deal with torture or killing by purely private groups.

The bill provides that a court shall decline to hear and determine a claim if the defendant establishes that the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred. This requirement ensures that U.S. courts will not intrude into cases more appropriately handled by courts where the alleged torture or killing occurred. It will also avoid exposing U.S. courts to unnecessary burdens, and can be expected to encourage the development of meaningful remedies in other countries.

A ten year statute of limitation insures that the Federal Courts will not have to hear stale claims. In some instances, such as where a defendant fraudulently conceals his or her identification or whereabouts from the claimant, equitable tolling remedies may apply to preserve a claimant's rights.

The TVPA is subject to restrictions in the Foreign Sovereign Immunities Act of 1976 [FSIA]. Pursuant to the FSIA, "a foreign state," or an "agency or instrumentality" thereof, shall be immune from the jurisdiction of the courts of the United States and of the States," with certain exceptions as elsewhere provided in the FSIA, and subject to international agreements to which the United States was a party at the time of the FSIA's enactment.

While sovereign immunity would not generally be an available defense, nothing in the TVPA overrides the doctrines of diplomatic and head of state immunity. These doctrines would generally provide a defense to suits against foreign heads of state and other diplomats visiting the United States on official business.

*IV. History of legislation*

 *Action in 100th Congress*

Legislation virtually identical to H.R. 2092 was introduced by Mr. Yatron and cosponsored originally by Judiciary Committee

Exhibit D

Chairman Rodino and Mr. Leach on March 4, 1987. The bill, H.R. 1417, was jointly referred to the Committee on Foreign Affairs and the Committee on the Judiciary. The Foreign Affairs Subcommittee on Human Righs held hearings on March 23 and April 20, 1988, and the Foreign Affairs Committee marked up and reported the bill favorably to the House with an amendment on June 7, 1988. The Judiciary Committee adopted an amendment in the nature of a substitute and reported the bill, as amended, favorably to the House by voice vote on September 30, 1988. This amended bill passed the House by voice vote on October 5, 1988.

### *Action in 101st Congress*

Legislation virtually identical to H.R. 2092 was also introduced in the 101st Congress. The bill, H.R. 1662, was introduced by Mr. Yatron on April 4, 1989, and jointly referred to the Committee on the Judiciary and the Committee on Foreign Affairs. Original co-sponsors included Judiciary Committee Chairman Brooks and Foreign Affairs Committee Chairman Fascell. The bill was marked up by the Subcommittee on Immigration, Refugees, and International Law on April 5, 1989, and ordered favorably reported, with an amendment, to the full Judiciary Committee by voice vote. The Judiciary Committee ordered the bill favorably reported, with amendments, to the House by voice vote on April 25, 1989. This amended bill passed the House by a vote of 362–4 on October 2, 1989.

### *Action in 102d Congress*

H.R. 2092 was introduced by Mr. Yatron on April 24, 1991 and jointly referred to the Committee on Foreign Affairs and the Committee on the Judiciary. On September 12, 1991, the Subcommittee on International Law, Immigration and Refugees ordered the bill favorably reported to the full Judiciary Committee by voice vote.

### COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this reports.

### COMMITTEE ON GOVERNMENT OPERATIONS OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Operations were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

### NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to

Exhibit D

the bill H.R. 2092, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, November 21, 1991.*

Hon. JACK BROOKS,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office (CBO) has reviewed H.R. 2092, the Torture Victim Protection Act of 1991, as ordered reported by the House Committee on the Judiciary on November 19, 1991. The bill makes any person who, under the authority of any foreign nation, tortures or extrajudicially kills any person liable to the injured party or the injured party's representative in a civil action.

Enactment of the bill would have no significant budget impact on federal, state or local governments. Also, enactment of H.R. 2092 would not affect direct spending or receipts. Therefore, pay-as-you-go procedures would not apply to the bill.

If you would like further details on this estimate, we will be pleased to provide them. The CBO staff contact is Kent Christensen, who can be reached at 226–2840.

Sincerely,

ROBERT D. REISCHAUER,
*Director.*

INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 3048 will have no significant impact on prices and costs in the national economy.

○